I can't hear you, Your Honor. Can you hear me? Yes. So we'll go ahead and call our first case for the day, France v. Bernstein. Mr. Comerford, you have the virtual floor. Thank you, Your Honor. May it please the Court, thank you for allowing me to appear remotely. We request five minutes of rebuttal time. My client, Jason Bernstein, is a successful NFL contract advisor, more commonly referred to as an agent. We're here in Philadelphia, and it's noteworthy that Mr. Bernstein just negotiated a new contract for Jason Kelsey, who's the center for the Philadelphia Eagles, making him the highest paid center in the National Football League. I'm sure Mr. Bernstein's great, but let's get to the questions, okay? Would you agree that we've got kind of a significant forfeiture argument that we've got to deal with here? I've been and looked at the things that you cite in your briefing as having put the district court on notice of the main argument you're making here, which is that it was futile because of Rule 45's territorial limits. You acknowledge that you didn't bring that in front of the district court, so how can we hear that argument and give it credence now? I think that we – well, we raised that argument on a motion for reconsideration very clearly with the district court. I do think it was raised in our underlying briefs, but not as expressly or not directly as the district court. Where was it raised in the underlying briefs? The underlying briefs are very specific about the argument about not having sufficient time, for example, and there's nothing about futility or Rule 45 on 100 miles. In opposing our motion to vacate, Mr. France did not make the argument that we could have subpoenaed these parties under Rule 45. Rule 45 wasn't discussed a lot. Why are you putting it to him that he should have raised the argument? You have to have made your argument, right? And your argument is it was futile. Without your futility argument, everything collapses, right? Let me back up. You don't disagree that you got a three-part test to make this case, right, and that one of those three prongs is you exercised due diligence, right? Yes. Okay, so your pitch is we were duly diligent, and this would have been futile. So that's how we come down to futility, isn't it? Futility is not one of the things that we must prove. It is a fact here. What I would say is that you should look at our due diligence in the totality of the circumstances. You should look at all of the efforts that we made to collect this information by initiating a lawsuit in the Middle District of Pennsylvania. So you don't think this comes down to futility? I think that futility is a big part of it. I don't think that the case necessarily turns on it. What the case turns on is whether we exercised due diligence or not, which is something that should be analyzed in the totality of the circumstances. All right, well, if futility doesn't govern here, then tell us why you didn't, for example. And I'm saying you. I don't know, Mr. Comerford. I'm not saying anything about you or your firm. I don't know anything about that. But I'm talking about Mr. Bernstein's efforts in that arbitration setting. Why wasn't there any effort to press for the CCA documents? Why wasn't there any effort to actually see whether you couldn't get CCA into court? Why wasn't there a pressure to get Mr. Galladay himself in? In other words, why were those things abandoned? We did not abandon them. We were pushing very hard for those things in the Middle District of Pennsylvania action. We filed that case in February of 2019, just one month after the signing event that's at issue. We immediately issued a subpoena to CAA Sports to try to get documents in March of 2019. And they refused to respond to the subpoena because they said there's no subject matter jurisdiction in the Middle District of Pennsylvania action. And we litigated that issue through 2019 until September 4th, 2019, when Judge Cain agreed with the defendants and said, there's no subject matter jurisdiction here because the amount of controversy requirement has not been met. And she dismissed the case without prejudice in September of 2019. So from September through December of 2019, we had no case. Why wasn't the diligent thing to do under those circumstances to delay the arbitration and to move to enforce? We had phone calls with the arbitrator about that, Your Honor, and he refused to do it. Well, we told him we were not ready. We did not have the evidence. We were pressing to get the evidence in the Middle District of Pennsylvania action. And then it wasn't until five days after the arbitration ended that Judge Cain changed course and agreed with us and said, there is federal subject matter jurisdiction. You have met the amount of controversy. That order came out on December 17th, 2019, in the Middle District case, five days after the second day of the hearing. If that order hadn't come out, we would not be here because we had no forum where we had any ability to get these documents from CAA Sports. Well, that's the very question I'm trying to get at. I know you wish that things had worked out and the timing better so that you could have used the mechanisms of your civil suit in the Middle District to get information that you could use in the arbitration. That's all very clear. What I'm trying to get an answer from you on is, in the arbitration itself, you got the arbitrator to give you subpoenas. And you, of course, had your opposing party. And Mr. Frantz, you serve a request on him. And he responds and says, I'm only going to give you stuff that I've got personally and nothing that's in CCA's possession, which candidly strikes me as a garbage position and a shocking position, a really, truly surprising position. And yet there's nothing that you do on your side to make that stick. There's no fight in front of the arbitrator. There's nothing that says we're entitled to the stuff that Mr. Frantz put his hand to. He can't say it's in the file in CCA and not give it to me. But that doesn't happen. Why doesn't it happen? I don't agree, Your Honor. There was a big fight in front of the arbitrator about that. There's a series of emails in the record. The one email I would ask you to look at in the appendix is page 2866. Mr. Frantz's attorneys say, Mr. Arbitrator, don't allow Bernstein to issue subpoenas at all. And if you do, they're not going to be enforceable in the Eastern District of Virginia because CAA is in California and Boone Enterprises is in New Jersey. And these others are in Illinois. So if Mr. Bernstein tries to enforce your subpoenas, it will be futile. That's on page 2866. And so Mr. Frantz knew of what he spoke because his attorneys represented Mr. Frantz, CAA sports, and two of the three memorabilia dealers at the time that Mr. Frantz's attorneys said this. I think you've got a question. You've got a question, I know. On page 2866, he represents that the federal court likely would not have authority to command out-of-state parties to appear if they're physically residing in the state where the court's situated. So he's not even making a firm representation that it's not possible. Even setting aside whether it would be diligent to rely on the opinion of opposing counsel in this regard. But it also misstates the rule. Rule 45 isn't limited to where a company resides. It's where it's regularly doing business. And there's no answer in your reply brief to the representation that CAA was doing business in Virginia and had a registered agent for service of process. So that is a new argument that Mr. Frantz has raised for the first time on appeal. I would say that by raising these new arguments, Mr. Frantz made any argument that we failed to raise things below. Because he's now raised two things on appeal. This idea that the subpoenas weren't served correctly, which was never litigated, never mentioned below. And the idea that CAA could have been served in Virginia. And we don't agree with that. The documents, when they were finally produced by CAA, CAA produced them from Los Angeles where its server was. So we had no ability to get those documents. Wait. The fact that they sent that from – let me make sure I understand your position. The position you're taking in front of us now is because it came from a server in California, there was no way you could have gotten that before. None. That is what Mr. Frantz represented to the arbitrator. Let's get on the same page, Mr. Comerford. I'm not asking you about what they represented. I'm asking about your legal position. Your legal position here is this was futile because the server it came from was in California. My position is two things. Number one, the territorial limits of Rule 45 apply. That's the Legion Insurance Company case from the Third Circuit, 2002, and also other cases like Dynergy Midstream Services that we cite, where they talk about how there's a gap in enforcement in arbitral subpoenas. You cannot compel witnesses to come more than 100 miles. You can't compel them to appear by telephone. That's the Managed Care Advisory Group case. Let's accept that. We're not communicating directly here, I'm afraid. I'm trying to get you to answer the question that I believe is raised by Judge Cain's opinion, and that specific question seems to me to implicate the assertion that there were tools that you could use that you failed to use, and I'm trying to ask about a very specific one. The opposing party, not even CCA, the opposing party, Mr. France, took a position that he was only going to give you stuff in his personal possession, not things that he'd written or that were his or that were, but if they happened to be in CCA's file drawer someplace, he wasn't going to give it to you. Since one of the killer documents here is his email to Mr. Gallaudet saying, here's the contract for the signing event, why is it that, or at least maybe I should ask it this way. You say, we fought over that. Did you ever get a definitive ruling from the arbitrator that the position taken by Mr. France, that it was only if he had it in his personal possession somehow that he was going to produce it? Did you ever put that in front of the arbitrator and get a ruling? Because if you did, I'm having a hard time finding it in the record. We did put that in front of the arbitrator, and he would give these cryptic statements that you see on page 2865 where he says, any party can request subpoenas, but it's not my responsibility to enforce subpoenas, and he would not answer the question. And Mr. France represented, I would say Mr. France's attorneys, and this is in the record, I think right after the emails we're talking about now, where Michael Iaconelli, his attorney, says, we're not going to produce things that are in CCA's possession. We're only going to produce things that are in Mr. France's possession. But that being said, Mr. France is producing everything that's in his possession, so there's no issue here. He assured the arbitrator and assured us that he wasn't withholding anything, and it turns out he was withholding emails that he himself had written that were on his own email account. I don't think it's true at all that those emails are not in Mr. France's possession, custody, and control within any reasonable understanding of that. The big reasons that we couldn't initiate an arbitration enforcement action were the 100-mile rule under Rule 45 and Judge Keene's ruling from September of 2019 that there was no federal question jurisdiction, which meant that we were dead on arrival if we tried to initiate an action in the Eastern District of Virginia in light of Judge Keene's ruling. That's debatable, given some other authority that's out there, but you've hit on an important point, which is Mr. France didn't just lie about the underlying matters. He lied about what was in his possession or custody or control. Did you ever put that in front of Judge Keene? Did you say, Judge Keene, this isn't just fraud on the arbitrator. This is a fraud because he was lying about what he had. And that's my—I'm sorry, go ahead. Your starting answer. I apologize, Your Honor. The answer is yes, we did talk about his non-production fraud. I believe that's in our briefs. I think it's in our motion to vacate, and I think it's opposing his motion to confirm, but I believe we talked about non-production fraud. I believe we talked about how the arbitrator didn't make Mr. France produce things from a CAA account. I mean, that was clearly discussed with the arbitrator. Did you bring that up in front of us? Did you argue it's non-production fraud here? I believe that's in our brief. I'll be very surprised if it's not, but that's certainly something we're talking about, and I can find it during the opposing party's discussion with you. Yeah, but if you could just put your finger on that, because the briefing really focused on this 45-mile—excuse me, the rule 4,500-mile limit. And there's not a—I don't recall a bell being hung on this, but— Switch gears for a minute. And instead of talking about futility and forfeiture, I want to talk about the fraud itself, because what you have to show is that the award was procured by fraud. So it looks like you have fraud in connection with the signing event, but the arbitrator found that Mr. Gallaudet made up his mind before that. In December 2018, it started in the summer with the charity event and then the dinner, and then he says that Saffold testified that Gallaudet decided to terminate Bernstein as his contract advisor and hire France instead during December 2018. So I'm not sure that the fraud that you appear to have established in January 2019 in connection with the signing event and maybe these discovery-related frauds is material to the arbitration award. Can you address that? The lie is that the fraud simply has to have a nexus to the decision. That's the Odeon Capital Group case from the Second Circuit, 2017. So there simply has to be a nexus between the fraud and the decision. And Mr. Kaplan, the arbitrator, he never says, I find in favor of Mr. France on two independent and separate grounds, one, that Mr. Gallaudet had already decided so it didn't matter, and two, Mr. France was not involved. He says the opposite. He says Mr. Gallaudet says that he had already made up his mind and France had no involvement with the signing, and I'm going to fine for him on that basis. So there's no way to separate those two things. We would have had a totally different arbitration hearing if Mr. France had admitted the truth. I think the signing was very material because Mr. Gallaudet could have switched at any time, and he didn't until the signing took place. Mr. France could have waited to do the signing until Mr. Gallaudet had signed with him, but instead he did this signing while Mr. Gallaudet was still Mr. Bernstein's client. And, you know, Mr. France is not the only one who was wrong at the arbitration. He called one other witness, Kenneth Saffold, and Kenneth Saffold testified that Todd France told him that he had nothing to do with the signing. Mr. Saffold said, I asked Todd about this, and Todd said I had nothing to do with that. That's on page 2164 of the appendix in the arbitration transcript at page 108 and 109. And then Mr. Saffold agreed with me that it would be improper. That's what he said, it would be improper if Mr. Saffold were to discover that Todd France or his company, CAA Sports, was involved in the memorabilia signing on January 21st, 2019. That's on page 2179. How does that answer the question about whether if Mr. Gallaudet had already made up his mind it doesn't matter? I mean, the fact that Mr. Saffold would have been upset to learn this. It matters because it would have changed everything about the arbitration. Mr. Saffold testified, I think, on both sides of this issue of whether Mr. Gallaudet had made up his mind. When I was questioning him, he said, well, I advised Mr. Gallaudet to wait until February of 2019 to make up his mind, which was after the Super Bowl. He said it wasn't that he advised him to make up his mind in February. He just said you should wait until the season's over to announce it, to do it. Right. It wasn't that he told him hold off and don't decide until later. I think that he, what Mr. Saffold testified is that he advised Mr. Gallaudet to wait until after the Super Bowl because we don't know which way this is going to go, continue to talk to both of these agents. Mr. Gallaudet continued to talk to Mr. Bernstein all the way through January of 2019. I don't think he made up his mind. But the fact is, Mr. France would not have testified untruthfully about his involvement in the signing if he knew it didn't matter. And he wouldn't have. Well, why not? It made him look bad. Why wouldn't he? It made him look bad. But I can see why he might do that. Well, the NFL regulations say that you cannot offer something of value to induce or encourage someone to pitch. Right. And Mr. Gallaudet was represented by Mr. Bernstein. Mr. France had not gotten Mr. Gallaudet off the fence. He was still on the fence. He was not signed until he gets to kick the tires and do this memorabilia signing event where they pick him up in a limousine at the airport. Yeah, we're familiar with the facts. But deal with this question that Judge Porter is putting to you. If as a finding of fact, the arbitrator says the decision had already been made. I think it might be an independent ground. Let me read to you from the arbitrator's decision. He says the record showed that Gallaudet had decided long before the signing event to change contract advisers, period. Furthermore, Saffold's testimony confirms and further supports that conclusion, period. In addition, France didn't participate in the signing event and so on. So it reads to me like it could be an independent ground. I don't agree. And all that we need to show is that there's a nexus between the fraud and the decision. We don't need to show that the decision would be different. And I submit to you that this arbitration goes completely differently if it is known and admitted that Mr. France set up this signing and emailed the contract to Mr. Gallaudet while he didn't represent Mr. Gallaudet and said, here's this thing I'm going to do for you. And then the very next day, Mr. Gallaudet calls my client and fires him. Okay. And that timing makes the causal connection very clear. All right. We're well over, but let me ask, any other questions? No. All right. Thanks, Mr. Comfort. You've reserved five minutes, and we'll have you back for that. May it please the Court, I am Glenn Weiner, Counsel for the Appellee, Todd France. Let me go right to the question that Judge Jordan, you started with, which is this futility argument and the due diligence question. District Court found that the appellant, Mr. Bernstein, had not demonstrated that he exercised due diligence to try to obtain the information in arbitration. Was he diligent enough to have given a demand for Mr. France to show up with Mr. France's documents and then have Mr. France, according to the other side, and it looks pretty bad for your side, just say, I'm not giving you anything that's not under my custody and control, and then not give an email that's his own email? So, Judge, Mr. France, his position wasn't that he wasn't going to give stuff in his possession. He said he would produce stuff in his possession, and he did. This email was found by CAA almost a year after the arbitration on its server. We can go back and read it, but I've read it. I've read the position that was put in front of the arbitrator, or excuse me, that was put back to Mr. Comerford's firm, and the assertion was, you know, in not such blunt language, but you're not getting it unless I've got it. That's right. Okay. So how is he in a position to not have custody and control of his own emails from the firm he's still working at? How can he take the position that, you know, that's CCA's, that's not mine. I sent that from my account to Mr. Gallaudet, but that's not something I'm giving you. Let me, if I can disagree with you for a second, Judge. Mr. France did not send that email. He didn't write it. He never saw it. I understand that it has an email address at CAA with his name on it, but this is, you've got to remember, this is a business email address, and other people may have access to that. That is very common in the business world. It's common for lawyers and judges. We all do this. Wait, wait. Let me make sure I got it. Yeah. Where to accept the word of Mr. France that an email that goes out over his name is not one he sent, even though it's been demonstrated that the man is a perjurer, that he lied? Or are you just taking the position that the fact that there's all this evidence that he knew what was going on is not to be believed? Well, let me back up, Judge, because I think it is, A, not been demonstrated that Mr. France testified falsely. B, there is no evidence that Mr. France had any involvement in the signing event aside from this one, or sorry, two emails, one email into his account, one email out, because if you look at the record that was created at the district court, every witness involved with that signing event has testified consistently that Mr. France had nothing to do with it. He showed up? The memorabilia dealer? I'm sorry. It was a coincidence that when the limo was showing up, it was picking him up as well as Mr. Gallaudet. All that stuff is not accurate. So, in fact, the record itself is very clear that the only people who attended the signing event, other than the memorabilia dealer who was putting it on, were Mr. Gallaudet and Mr. Gallaudet's companion, his girlfriend. I'm talking about the memorabilia dealer's email. The memorabilia dealer's email says, yeah, have the limo there. Todd's going to be there. I mean, nobody's questioning that Todd is Todd France, are they? I don't know. So let me talk about, it was not an email. It was a text message from one of the. I'm sorry, a text message. A text message that said, car for Kenny, referring to Mr. Gallaudet, Kenny's mom, and Todd CAA. Now, of those three people identified in that text message, one of the three attended, Mr. Gallaudet. The other two did not. Who cares whether he was actually there? The question that's being put to you is, isn't the evidence overwhelming that Mr. Todd France knew what was going on, and that knowing what was going on, he just went in and said, yeah, I have no idea. I just have no idea how this happened. No. Actually, I don't think it is overwhelming at all, Judge. You've got a text message from a memorabilia dealer that is wildly incorrect. It talks about three people attending, two of whom did not, neither Mr. Gallaudet's mother nor anyone named Todd. Is it really your position that he didn't have an obligation to run a search and turn over documents from his own email account that were sent and received under his email account? So the email, the fact that there was an email on CAA's server found sometime later in response to a subpoena does not mean that that email was in Mr. France's account at the time that he was served with a document request and responded to it. There are a lot of emails from six months ago that aren't in my email account anymore in my office. I'm sure the same is true with yours, Judge. They may still reside on a server somewhere that is accessible to my employer. That's a different thing. It's not accessible to him. It may not be accessible to him. Those are very different things. All this comes back to the idea that we're to believe that he didn't have custody and control of an email that was sent in his name, right? That is very well true. Companies have all sorts of policies about automatic archiving of emails, automatic deletion of emails after a certain period of time. Assume for the sake of discussion that we didn't buy that. Okay. We didn't think that was true and that, in fact, there was fraud in the failure to produce and that that was kind of fundamental to the case. Does that affect the position about diligence at all? It does not. Let me explain one other point that's very important here. There was a request to Mr. Frantz for document production. Mr. Frantz took a position about the scope of his document production. Okay? There was – to speak between the parties. What was the specific position he took about the scope of his production? That he would produce documents that were in his possession but that he was not going to go back to CAA. He couldn't go back to CAA. Not custody and control, just possession, right? He just said, if I don't have it, you don't get it. I'm not sure I could quote you on that exactly, Judge. But what I will say is that there was this distinction that was drawn by Mr. Frantz at the arbitration. And there was debate with the arbitrator about it that Mr. Comerford raised. And in the record, Mr. Comerford says to the arbitrator that, quote, unquote, to end the debate, please issue a subpoena to CAA. That's at page 28, 13, 28, 14 of the appendix. That's Mr. Comerford's email. To end the debate, I want a subpoena to CAA. And Mr. Comerford – Mr. Kaplan, the arbitrator, says, absolutely, you can have a subpoena to CAA. Mr. Comerford then fails to serve the subpoena on anyone other than Mr. Frantz's counsel. Right? He doesn't do that. He doesn't go to court. We should spend a lot of time talking about things that didn't happen. But as to the things that did happen, having served – having made the document request to Mr. Frantz and being told you're only getting what I've got and not – you know, if it's in my possession, you get it. Otherwise, no, in effect. Is the fact that he's prepared to say, after some back and forth with the arbitrator, okay, let's subpoena CCA, does that mean that Mr. Frantz's – if we accept the argument that there was fraud about what he didn't have custody and control over, does the fact that he didn't take further steps at that point with respect to Mr. Frantz mean he was not diligent? Well, at that point, Mr. Frantz made his document of production. It was – he produced what he had available to him. And there was a subpoena to CAA that was never served, never pursued. If he wanted evidence further from CAA, he had the opportunity to do that, and he didn't. Mr. Kumher, for me, the representation a short while ago that they did seek to have a delay in arbitration for the purposes of enforcement and that the arbitrator refused. Do you dispute that? I don't believe that's in the record anywhere in the district court. Now, I wasn't trial counsel, so I don't know every conversation or email. All I know is what's in the record, which, of course, is what binds this court. And there's no evidence in the record that there was a motion made to seek a delay of the arbitration. It was denied by the arbitrator or any relief sought in court. Now, of course, if Mr. Bernstein had wanted more time to try to enforce a subpoena and the arbitrator had denied it, Mr. Bernstein could have gone to court and said, court, stay this arbitration so you can enforce the subpoena. But, in fact, Mr. Bernstein never really wanted to get the evidence from CAA. Mr. Bernstein instead asked for an adverse inference against Mr. France. He never wanted to get evidence from Mr. Gallaudet or Mr. Gallaudet's mother. He didn't actually want them to testify. He wanted to create this kind of empty chair argument and ask for an adverse inference. That was a strategic choice he made. He didn't pursue the evidence. He asked for the adverse inference. It was rejected by the arbitrator. That's the arbitrator's decision. Well within the arbitrator's discretion. And it's something that this court, district court, didn't disturb and this court shouldn't disturb either. So the idea that he couldn't get enough time to pursue the evidence is simply unsupported at this point. Do you want to speak to the materiality argument, Mr. Bernstein? Yes.  Mr. McCommerford has made the assertion that under Odeon it's enough to show a nexus. What's your response? Well, so I think there are, in this case, two independent grounds on which Arbitrator Kaplan rejected the 3B2 claim, which is the one that's at issue here. The arbitrator found that Mr. Gallaudet had made his decision in December, long before the signing event ever became an issue, and that because the decision had been made, the idea that something was being used afterwards to induce him to make a decision simply didn't work under the regulations. Right. And Judge Porter's read that into the record right here in this argument. I'm trying to get you to answer the assertion that Mr. Commerford has made, which is that doesn't matter because we don't have to show the outcome would have been different. We only have to show there's a nexus, a significant nexus, between the alleged fraud and the decision. And here the fraud is all over this, and the whole arbitration would have gone differently if that had been exposed. So the idea of a nexus of the fraud is not exactly the standard. The standard is set forth in the Statute 10A1, which is that the award to be vacated, the award must have been procured by fraud. And when you look at when courts honing on that language of procured by fraud, if there is an independent ground that supports the arbitrator's award, it makes the alleged fraud on the other point irrelevant. And I would point to the full sentence. I'm going to read you from Odeon. It says, For fraud to be material within the meaning of Section 10A1 of the FAA, petitioner must demonstrate a nexus between the alleged fraud and the decision made by the arbitrators, although petitioner need not demonstrate that the arbitrators would have reached a different result. Now, I warrant you that that's a Second Circuit case, not a Third Circuit case, but we tend to pay attention to these sister circuits. Yes. So when you say that isn't the standard, that's the standard in at least one circuit court, why shouldn't we pay attention to that? What I ask you to pay attention to as well, Judge, is the Fifth Circuit's decision in Forsyth, 915 F. Second, 1017. Mr. Comerford cited that in his brief multiple times. And the court there explains that that nexus has to be a nexus to a material issue, that is, that causes the award to be procured by fraud. Isn't, for instance, credibility a serious enough issue that that nexus is satisfied, that it's a sufficiently close connection where even the finding that this would have happened, that the decision had been made earlier that he was going to retain France, didn't that turn at least in part on a credibility determination as to France? No, I don't think it did, Judge, because there was no contrary evidence introduced at all. Exactly. So there was no evidence introduced on the other side of that question. What you had is the evidence. There was circumstantial evidence, right? I mean, there's the signing event and then there's the change. That's certainly circumstantial evidence. And if there's evidence in the record that Mr. France is a liar, that he's just not telling the truth, then why isn't that material? Why isn't that exactly in the Eleventh Circuit's Bonar case realm where the court in that case said, look, this perjury is so dramatic, it has to have affected. I see my time has concluded. May I have a brief answer, Your Honor? Please. So on the issue of when Mr. Gallaudet's decision was made, you had Mr. Gallaudet's testimony by affidavit, which was received by the arbitrator. You had Mr. Saffold's testimony, which, contrary to the way it's been characterized by Mr. Comerford, was addressed by the arbitrator in his decision, and he found that Saffold's testimony also was consistent with the idea that the decision had been made by Gallaudet long before the signing event. So that's a fact decision that was made. So Mr. France's testimony is just irrelevant to what you're saying because there was other stuff in there. To this point, it is irrelevant because there's this when Mr. Gallaudet made the decision, all the evidence that was in the record supports that it was made previously. And if the arbitrator had seen all these documents, these other things, had seen Mr. France's e-mail, which you're saying isn't Mr. France's e-mail, but which has Mr. France's name on it, if he'd seen the text messages that said, be ready to pick Todd up at the event, if he'd seen these things, it just wouldn't have made a difference. There's just not a connection there is what you're saying. When you compare it to the statement of the player himself, Mr. Gallaudet, who made the decision and said he made it previously, plus his mentor, advisor, Mr. Saffold, Captain Saffold, who said, Kenny made this decision back in December. And who also said Mr. France said he had nothing to do with the signing of that. Yes, that's correct. Mr. Saffold said that as well. All right. Well, we got you. I think we have your position, though. Let me ask my colleagues if they've got any questions. The OEM court also said in that decision that if the alleged fraud went only to a collateral issue  then that fraud cannot serve as a basis for vacating the award. So it seems like, according to the Second Circuit, there can be fraud, right? And it doesn't necessarily overturn the award. So can you explain why? Just assume that there is fraud. I mean, I think we all sounds like we all agree there was fraud in connection with the signing event and maybe with the discovery issues. Assuming that, can you explain why that fraud was collateral and did not influence the arbitrator's findings? Well, I think it comes back to the reasons that I was just pointing out, right? That you had the statement from Mr. Gallaudet, I made my decision previously, signing that was irrelevant. And there's no contrary evidence, right? Correct. There's no contrary evidence. There's certainly none that's been developed in the district court record. You have Captain Saffold's testimony, which the arbitrator heard all of it and heard the cross-examination and made the conclusion that Saffold's testimony supported the idea that the decision had been made previously. You had the affidavit from Ms. Wright Whitaker, Mr. Gallaudet's mother, who had also supported the same conclusion. Mr. Gallaudet had made that decision previously in December. I understand all the evidence that points to he made the decision in December. What I'm asking you to say is why the fraud issue is collateral to that subject. Because the question of this disputed testimony that is now at issue on this appeal relates to events that happened after a decision was made. You can't, as the arbitrator concluded, the regulation that he is in charge with interpreting, if a decision has been made by the player to hire an agent, you can't then effort to Without something of value having been offered. Without something of value having been offered. Then. Then you can't induce them by offering something of value at a later date. So that's the issue here because the point of the regulation is, did the agent try to induce the player to sign with the agent? It's not even to switch from another agent. This is not a competition issue among agents when you read the regulations. But it's did you try to induce them to make a decision to switch? If they already decided to switch, it's irrelevant whether you then offered them something theoretically of value and whether this qualifies as something of value to the signing event. I think what they're really talking about is kind of some of the bad practices that used to happen where agents would come in and offer gifts, extravagant gifts, to try to sign players. Different issue. But again, that's all for the arbitrator to decide as the expert on the NFLPA regulations. So I think it's because you can't induce somebody to do something they've already decided to do, that it makes this stuff about the signing event irrelevant to the case, irrelevant to the award. And I think in addition to kind of the language that Judge Porter you were pointing to in Odeon, again, I would point the court to the Fifth Circuit's decision in Forsyth where it says, if there's an independent ground that supports the decision, then the award has to be affirmed regardless of whether there's alleged fraud. The Dean Foods case, which I know is a district court, also same point. Thank you. Thanks for your argument. We'll hear from Mr. Comerford on the phone. Thank you, Your Honor. Your Honor, we did discuss the non-production fraud in our briefs before this court, starting on page 36 of our opening brief and starting on page 15 of our reply brief. The representations made by opposing counsel that we somehow didn't want the evidence are totally false. We asked the arbitrator to delay. As soon as we learned five days after the second day of the hearing, we learned that the Middle District case is going to go forward. Where's that record? That's in the record at page 1758. We asked him to delay, and then he refused to delay. And that's on, I will find that page. It occurred in March, and it's page 1762. Mr. Kaplan denied our request to delay. And in December, we were allowed to go forward in the Middle District action, and then we reissued the discovery to these memorabilia dealers, and we said, again, who did you work with to set up this signing? And they responded to our discovery requests, and they denied that CAA was involved. They omitted any mention of CAA. That's page 1933, 1934, 1935 in the appendix. Mr. Comerford, speaking of these memorabilia dealers, one of them is in York, Pennsylvania, right? Yes. Was there any effort to enforce the subpoena with respect to that dealer? In the subpoena issued from the arbitration? Yeah. We did not because of Rule 45. Well, isn't York within 100 miles of the Middle District? Isn't it in the Middle District? I don't know. I think I'm pretty sure. The Federal Arbitration Act requires us to initiate subpoena enforcement actions in the district encompassing the site of the arbitration. I think it's Section 9 of the Federal Arbitration Act. So we can't initiate arbitration subpoena enforcement actions anywhere other than the Eastern District of Virginia. Right. But the other side has made this assertion, has made this argument about the Amgen case, which you didn't respond to in your reply brief, but they spent two or three pages on it in their answering brief that there's authority out there for you to have done exactly that, to get a subpoena issued from the Middle District in support of the arbitration. And that case is a total outlier. I think it's never been followed. It's from 1995. It's from a previous version of Rule 45. The Legion Insurance Company versus John Hancock Mutual Life Insurance case from the Third Circuit, 2002, says flatly that the 100-mile territorial limit of Rule 45 controls arbitration subpoenas. And the Federal Arbitration Act says you must initiate your arbitration subpoena action in the court encompassing the site of the arbitration. Good. I got you on that. In the time you've got left, would you speak to the materiality point? The materiality point is illustrated by the fact that on March 2nd, 2020, the memorabilia dealers gave us interrogatory responses and they omitted any mention of CAA. We asked them, who has knowledge of this signing? They omitted it. I'm sorry. Because the reason is – I've got to interrupt you. I didn't make my question clear. I apologize. When I say the materiality point, I'm asking you to go to that point about collateral issue that Judge Porter was questioning Mr. Weiner about. Speak to that, the assertion that the decision had been made. So fraud is a bad thing, shame on Mr. France, but who cares? It's a central issue in the arbitration. The arbitrator wouldn't have talked about it so much if it wasn't the central issue. Mr. France's attorneys wouldn't have elicited this testimony from him over and over again in the arbitration. If you look at what we cite in our brief, they say over and over again, Mr. France, listen very carefully to my question. Did you have anything to do with this? And he says, no, I had nothing to do with it. They made a really big deal of it in the arbitration before the arbitrator. And Mr. France looked at the arbitrator with great sincerity and said, I had no involvement in this. We then get the e-mail that he sent from his computer, and we discovered that that e-mail was sent from his iPhone. We didn't learn that until June of 2021. That means that that e-mail resided on his iPhone with him in Atlanta, Georgia, and on CAA's servers in California. So it was utterly wrong for Mr. France to say that he didn't have that e-mail in his possession, custody, or control the whole time. That e-mail was there. The metadata shows that it was sent from his iPhone and not from a computer. Is that in the record? Is that in the record? That's not in the record because that's from June of 2021, as we have continued to doggedly pursue this in the Middle District of Pennsylvania action, which we've done since December of 2019 when the motions to dismiss were denied, and off we went. And we've been working on it ever since. The information is trickling out. We have an order. We have several motions to compel in that Middle District of Pennsylvania action, and if you look, there is a compliance date today when CAA Sports has to produce information to us about whether Mr. France actually went to Chicago on January 21st, the day of the signing, and that's an order on a motion to compel from Judge Susan Schwab. The compliance date is today because we have a flight record from Delta Air Lines we got after we were able to do discovery in the Middle District case, and Delta Air Lines says that Todd France had a reservation to fly to Chicago on January 21st, 2019, the day of the signing. On this materiality point, I understand, I think your position is because he lied, France lied about the signing event, that casts doubt on the arbitrator's finding that Gallaudet decided to switch agents in December of 2018. But what does that, what do you say, I mean, Gallaudet and his friend testified that the decision was made then. Were they lying too? I mean, how does the fraud undermine the testimony that the arbitrator relied on to find the decision was made in 2018? So the evidence was that Mr. Gallaudet was talking to Mr. Bernstein, who was his agent, and to Mr. France, who was not his agent, and he was weighing a decision, and then he hadn't switched. You know, everyone knows that you don't have a client until the client signs with you. I know, but the arbitrator found that he had switched, that he made the decision. The regulation he violated says that you cannot offer something of value to induce or encourage. So what matters is what is in Mr. France's mind. Mr. France is the one doing the offering. How about Gallaudet's mind? Gallaudet's mind. I would submit to you that if you really look at the reg, it's not relevant what's in the player's mind. There's no written record of that. There's no contemporaneous text message or anything from December 2018 where Mr. Gallaudet says, you know, Mr. France, I'm going to sign with you. There's no evidence of that. It's just Mr. France saying it and Mr. Gallaudet saying it, and it's totally self-serving. And when you look at the evidence, Mr. Gallaudet didn't switch until the day after this signing. So Mr. France offered this signing to get Mr. Gallaudet off the fence, and it worked. To be clear, from Mr. Gallaudet, there's only an affidavit. Is that right? You sought to depose him, and that was denied? Yes. Yes. And Mr. France's attorneys told Judge Kain in July of 2019, they said, Judge Kain, don't allow any discovery to go forward in this case because Mr. Gallaudet is going to be deposed, and he's going to testify in the arbitration. And that was not true. This is what happened. They said that on page 1700 of the transcript, page 1734, they urged Judge Kain to not allow discovery to go forward because Gallaudet, quote, will have to be deposed or testify in the arbitration. So we were caught between these two forums where Mr. France's attorneys are saying to Judge Kain, don't allow any discovery. All these questions are going to be answered in the arbitration. And then they go to the arbitrator and they say, don't allow any discovery, Mr. Arbitrator, because you don't have the power to do it. It was only two months later. It was only two months after they talked to Judge Kain, and they said, don't allow discovery, Judge Kain. And on September 27, 2019, they urged the arbitrator to not allow Mr. Bernstein to depose any third parties. That's on page 1749. We're well past your five minutes, but if my colleagues will indulge me, I'll ask you one last question. The standard of review here is abuse of discretion when we're looking at Judge Kain's decision. Is that right? As I understand it, the standard is de novo on the motion to vacate and it's plenary on questions of law. And I think it's abuse of discretion on the denial of the motion for reconsideration. But because that's really a question of simply it's not a new argument, it's simply applying Rule 45. And it's also to prevent manifesting justice. That's under Rule 59. Yeah. So in order to get past abuse of discretion, do we have to agree with you that what you're making here with respect to the 100-mile limit and the futility is not a new argument? I think it's simply pointing out the operation of a federal rule of civil procedure rather than a new argument. And it's also to prevent manifest injustice. So even if it is a new argument, the rule allows the court to prevent injustice. Okay. Good? Good. All right. Thank you, Mr. Comerford. Thank you, Mr. Weir. I'm sorry about your travel difficulties, sir. I'm glad you could appear remotely. And we've got the matter under advice.